**DENTON PETERSON DUNN, PLLC**
Jay F. Parmelee, Esquire (AZ Bar No. 274676)
Email: jay@dentonpeterson.com
1930 N. Arboleda, Suite 200
Mesa, AZ 82513
Telephone: (480) 325-9900
Fax: (480) 325-9901

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| Deborah Northcutt, Jamin Bracken, Scott Wolstenholm and Trent Lyght, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Gen Digital Inc., f/k/a NortonLifeLock Inc., f/k/a Symantec Corporation, The Board of Directors of Gen Digital Inc., The Employee Benefits Administrative Committee ("Board"), and John Does 1-30,<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs, Deborah Northcutt, Jamin Bracken, Scott Wolstenholm, and Trent Lyght ("Plaintiffs"), by and through their attorneys, on behalf of the Gen Digital Inc. 401(k) Plan (formerly known as the NortonLifeLock 401(k) Plan, formerly known as the Symantec Corporation Section 401(k) Plan)[1] (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Gen Digital Inc., f/k/a NortonLifeLock Inc., f/k/a Symantec Corporation ("Gen Digital" or the "Company"), the Board of Directors of the Company ("Board"), and the Employee Benefits Administrative Committee (the "Committee") for breaches of their fiduciary duties.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

3.    The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a

---

[1] "Effective November 4, 2019, the Plan, shall be renamed the 'NortonLifeLock 401(k) Plan' and all references to the 'Symantec Corporation Section 401(k) Plan' therein shall be replaced with references to the 'NortonLifeLock 401(k) Plan.'" Ninth Amendment to the Symantec Corporation Section 401(k) Plan, at 1; *see also* Fourteenth Amendment to the NortonLifeLock 401(k) Plan, at 1 ("The name of the Plan shall be changed to the 'Gen Digital Inc. 401(k) Plan,' effective as of November 7, 2022."). The Symantec Corporation Section 401(k) Plan, as amended and restated, effective as of January 1, 2015, and any Amendments thereafter will be referred to as "Plan Document" or "Plan Doc."

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and their participants.

1  prudent process for selecting investment options and service providers," including providers

2  of the Plan's administrative and recordkeeping ("RKA") services.[3]

3      4.    With regard to plan fees, the DOL states "You should know that your employer

4  also must consider the fees and expenses paid by your plan."[4]

5      5.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial

6  consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.

7  In devising and implementing strategies for the investment and management of trust assets,

8  trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

9      6.    At all times during the Class Period, the Plan had about $1 billion in assets under

10  management. At the Plan's fiscal year end in 2019, the Plan had $1,241,884,655 in assets

11  under management that were entrusted to the care of the Plan's fiduciaries. *See* 2019 Form

12  5500 for the Plan ("2019 Form 5500") at Schedule H, p. 2. At the Plan's fiscal year end in

13  2023, the Plan had $995,825,175 in assets under management. *See* 2023 Form 5500 at

14  Schedule H, p. 2.

15      7.    The Plan's assets under management makes it a jumbo plan in the defined

16  contribution plan marketplace, and among the largest plans in the United States. In 2021, only

17  0.2 percent (1,011 of 641,747) of Plans in the country had more than $1 billion in assets under

18  management. In 2019, at the start of the Class Period, only 0.1 percent (776 of 603,217) of

19  401(k) plans in the country were as large as the Plan.[5]  The Plan's assets under management

20  makes it among the largest plans in the United States.

21      8.    Given the amount of Plan assets, the Plan should have had substantial

22  bargaining power with recordkeepers regarding the fees and expenses to be charged for RKA.

23

24

25

---

26  [3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

27  [4] *Id*.

28  [5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

As is apparent, however, Defendants did not use that bargaining power to reduce the Plan's expenses.

9.    Defendants failed to employ a process to leverage the size of the Plan to pay reasonable fees for the Plan's RKA services. Defendants, as fiduciaries of the Plan, breached the duty of prudence they owed to the Plan by requiring the Plan to pay excessive RKA fees.

10.    Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's RKA costs.

11.    Another way in which Defendants breached their duty to Plan participants was in failing to defray[] reasonable expenses of administering the [Plan]. 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds to reduce Company contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for RKA services. This action by the Company was a clear breach of the duty of loyalty to Plan participants and cost Plan participants millions of dollars.

12.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), breach of ERISA's Anti-Inurement Provision (Count III) and failure to monitor fiduciaries (Count IV).

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to

29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### A.    Plaintiffs

17.    Plaintiff, Deborah Northcutt ("Northcutt"), resides in Casa Grande, Arizona. During her employment, Plaintiff Northcutt participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Northcutt suffered injury to her Plan account by overpaying for her share of RKA costs.  Plaintiff Northcutt also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Northcutt's individual account to pay for the RKA costs.

18.    Plaintiff, Jamin Bracken ("Bracken"), resides in Sacramento, California. During his employment, Plaintiff Bracken participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Bracken suffered injury to his Plan account by overpaying for his share of RKA costs.  Plaintiff Bracken also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Bracken's individual account to pay for the RKA costs.

19.    Plaintiff, Scott Wolstenholm ("Wolstenholm"), resides in San Jose, California. During his employment, Plaintiff Wolstenholm participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Wolstenholm suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Wolstenholm also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Wolstenholm's individual account to pay for the RKA costs.

20.    Plaintiff, Trent Lyght ("Lyght"), resides in Alpharetta, Georgia. During his employment, Plaintiff Lyght participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Lyght suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Lyght also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Lyght's individual account to pay for the RKA costs.

21.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct.

22.    Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.    Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**B.    Defendants**

**Company Defendant**

24.     Gen Digital is the Plan Sponsor for the Plan with a principal place of business at 60 E. Rio Salado Parkway, Tempe, Arizona. *See* 2023 Form 5500 for the Plan, at 1.[6] According to its website, Gen Digital "is a global company dedicated to powering Digital Freedom through its trusted consumer brands including Norton, Avast, LifeLock, MoneyLion and more."[7]

25.     "The initial appointment of Committee members and any subsequent appointment upon the occurrence of a vacancy of a member of the Committee shall be made by the Board of Directors of the Sponsoring Company." Plan Doc., at 17; see also Report of Independent Auditors attached to 2023 Form 5500 ("2023 Auditor's Report"), at 8 (""The Company has appointed the Gen Digital Inc. Employee Benefits Administrative Committee (the "Committee") to manage the operation and administration of the Plan."

26.     The Company appointed the Committee to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     Accordingly, during the putative Class Period, Gen Digital is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

28.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

---

[6] As discussed above, the defined term Gen Digital or Company refers to Gen Digital Inc. who was the Plan Sponsor effective November 7, 2022. On November 7, 2022, NortonLifeLock Inc. was renamed Gen Digital Inc. NortonLifeLock Inc. was the Plan sponsor from November 4, 2019 to November 6, 2022. Effective November 4, 2019, Symantec Corporation was renamed NortonLifeLock Inc. Prior to November 4, 2019, Symantec Corporation was the Plan Sponsor.

[7] *See* https://www.gendigital.com/us/en/ last accessed on May 13, 2025.

29.     Gen Digital, acting through its Board,[8] appointed the Committee. Accordingly, like the Company, the Board had a concomitant fiduciary duty to monitor and supervise the Committee.

30.     Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

31.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

32.     As discussed above, Gen Digital and the Board appointed the members of the Employee Benefits Administrative Committee to, among other things, ensure that the Plan had no more expense than reasonable and/or paid a reasonable rate for RKA services given the size of the Plan. As will be discussed below, the Employee Benefits Administrative Committee fell well short of these fiduciary goals.

33.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans' assets.

34.     "The Committee shall be responsible for the administration of the Plan, in accordance with the provisions of Section 5 of the Plan." Plan Doc., at 16.

35.     "'Plan Administrator' shall mean the Committee." Second Amendment to the Plan Document, at 1.

---

[8] For the period prior to November 4, 2019, the defined term Board shall refer to the Board of Directors of Symantec Corporation. For the period from November 4, 2019 to November 6, 2022, the defined term Board shall refer to the Board of Directors of NortonLifeLock Inc. And for periods subsequent to November 7, 2022, the defined term Board shall refer to the Board of Directors of Gen Digital Inc. or a related entity having a board of directors that acts in that capacity or a similar capacity for Gen Digital Inc.

36.    The Plan Administrator's responsibilities include, "Adopt such policies, rules and regulations as it may deem necessary or desirable, in order to carry out the provisions of the Plan and the Trust and to comply with the requirements of ERISA and the Internal Revenue Code; provided, however, that the Committee, and not the Plan Administrator, shall have the power and duty to adopt a funding and investment policy, as set forth in Section 5 of the Plan." Plan Doc., at 16-17.

37.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

38.    To the extent that there are additional officers, employees and/or contractors of Gen Digital who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager or consultant for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Gen Digital officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS[9]

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

39.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of Gen Digital Inc. 401(k) Plan (formerly known as the NortonLifeLock 401(k) Plan, formerly known as the Symantec Corporation Section 401(k) Plan) at any time between <u>August 4, 2019</u> through the date of judgment (the "Class Period").

40.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 6,226 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

41.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

42.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C.    Whether Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

---

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

43.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

44.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

46.    The Plan is a defined contribution plan covering substantially all eligible employees of Gen Digital. *See* Plan Doc., at 2 ("This Plan is intended to qualify as a defined contribution plan with an employer matching contribution and a cash-or-deferred feature."); *see also* 2025 Auditor's Report, at 8 ("The Plan is a defined contribution plan that was established on January 1, 1988, by Gen Digital Inc. (the Company), formerly known as NortonLifeLock Inc. to provide benefits to eligible employees, as defined in the Plan Document.").

47.    "[T]he purpose of the Plan is to provide benefits for Participants and their Beneficiaries as a result of the death, Disability or other Termination of Employment of such Participants." Plan Doc., at 2.

***Eligibility***

48.    In general, the Plan covers substantially all employees of Gen Digital from the first day of employment. *See* Plan Doc. at 15 ("Each individual who becomes an Employee on or after January 1, 2006 shall be eligible to participate in the Plan immediately after completing one Hour of Service"); *see also* 2023 Auditor's Report at 11 ("Employees of the Company are eligible to participate in the Plan immediately upon hire, as soon as administratively feasible.").

***Contributions***

49.    "[E]ach Eligible Participant may elect to have a percentage (in multiples of one percent (1%), but not exceeding fifty percent (50%)) of his Compensation for such Plan Year contributed to the Trust on a salary-reduction basis in an amount not to exceed the 'applicable dollar amount' (as provided in Section 402(g)(1)(B) of the Internal Revenue Code) for the calendar year." Plan Doc., at 21; *see also* 2023 Auditor's Report, at 11 ("Participants may elect to have the Company contribute their eligible pre-tax or after- tax compensation to the Plan up to the amount allowable under the Plan Document and current income tax regulations.").

50.    The Plan also permits the automatic enrollment of eligible employees in the Plan. *See* Tenth Amendment to the Plan, at 1 ("In the case of an Eligible Participant who is hired or rehired by a Participating Company on or after *January 1, 2012*, and who fails to make an affirmative election of Elective Deferral Contributions … within thirty (30) days following the eligibility date specified in Section 3.1(c), the Eligible Participant shall be deemed to have elected, effective as of the first payroll period beginning after such thirtieth (30th) day … to make Elective Deferral Contributions of four percent (4%) of an Eligible Participant's Compensation as a default contribution percentage in the absence of an Elective Deferral Contribution election (referred to herein as an "Automatic Contribution")").

51.     The Plan allows participants to make catch-up contributions (Plan Doc., at 23-24) and Roth elective deferral contributions (*id*., at 24).

52.     The Plan also provides for employer matching contributions.

53.     "The Participating Companies shall make Matching Contributions for each payroll period, on behalf of each Eligible Participant who makes an Elective Deferral Contribution for such payroll period, equal to fifty cents ($.50) for each one dollar ($1) of any Elective Deferral Contributions made by such Eligible Participant, up to six percent (6%) of such Eligible Participant's compensation for such payroll period." Plan Doc., at 25.

54.     Like other companies that sponsor 401(k) and 403(b) plans for their employees, Gen Digital enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 403(b) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

55.     Gen Digital also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

56.     Given the size of the Plan, Gen Digital likely enjoyed significant tax and cost savings from offering a match.

***Vesting***

57.     Participants are automatically vested in any contributions they made to their accounts themselves. *See* Plan Doc., at 45 ("A Participant is fully vested in his Elective Deferral Contributions Account, his Catch-Up Contributions Account, his Rollover Account, his Transfer Contributions Account and his Roth Elective Deferral Contributions Account at all times.").

58.     A Participant's Matching Contributions Account shall be subject to the following vesting schedule based upon the date on which Matching Contributions were

credited to such Account and upon the number of Years of Service that the Participant has completed as of the date of his Termination of Employment:

| Years of Service | Vesting Percentage |
|---|---|
| 0 | 0% |
| 1 | 25% |
| 2 | 50% |
| 3 | 75% |
| 4 | 100% |

Plan Doc., at 45-46.

*Forfeiture*

59.    "Upon the Termination of Employment of a Participant who has not become fully vested, who has not incurred a Disability, or who has not attained Early Retirement or Normal Retirement, the amounts in such Participant's Matching Contributions Account, minus the Vested Interest in such Matching Contributions Account … shall be treated as having been forfeited." Plan Doc., at 47.

60.    "Upon such Forfeiture, the Sponsoring Company shall determine, in its sole discretion, whether the Non-Vested Amount shall be used to reduce Matching Contributions to the Plan, or whether the Non-Vested Amount shall be used to pay administrative expenses of the Plan." *Id*.; *but see* 2023 Auditor's Report at 8 ("Forfeited nonvested accounts … will be used to pay plan administrative expenses, with any excess used to reduce the employer's matching contribution.").

61.    The Company chose to use funds in the forfeiture account to offset employer matching contributions.

*Payment of Plan Expenses*

62.    "The Plan pays substantially all the Plan's expenses." 2023 Auditor's Report, at 8.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.    The Totality of the Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

63.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

64.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

65.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

### B.     ERISA's Fee Disclosure Rule

66.     In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[11]

67.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

68.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions

---

[11]     *See*     https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf     ("DOL 408(b)(2) Regulation Fact Sheet").

about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

69. For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

70. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

71. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

72. Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**C.   Much Information Regarding the Reasonableness of Fees for Recordkeeping Services Are in the Sole Possession of Defendants**

73. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

74. A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates

that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

75. More specifically, a RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

76. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they were "likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[12]

77. Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information and must therefore look at circumstantial evidence showing whether or not an RFP took place in this case.

**D. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees**

    **1. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants**

78. Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

---

[12] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

79.     There are two essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

> A.     Basic account recordkeeping (e.g. demographic, source, investment and vesting records);
>
> B.     Multi-channel participant and plan sponsor access (e.g. phone, web);
>
> C.     Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);
>
> D.     Payroll service (e.g. hardships, in-service withdrawals, termination distributions);
>
> E.     Participant tax reporting services (e.g., IRS Form 1099-R);
>
> F.     Participant confirmations, statements, and standard notices;
>
> G.     Plan-level reporting and annual financial package (excluding IRS Form 5500);
>
> H.     Participant education (e.g. newsletters, web articles, standard communication materials);
>
> I.     Plan consulting (e.g., preapproved document services, operational materials);
>
> J.     Plan consulting (e.g. preapproved document services, operational compliance support).

80.     This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

81.     The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

> a.     Loan processing;
>
> b.     Brokerage services/account maintenance (if offered by the plan);
>
> c.     Distribution services; and
>
> d.     Processing of qualified domestic relations orders.

82.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

83.     The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. See 1998 DOL Study,   at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. *Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis*.

84.     In general, the level, number and character of participant services provided by

the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant***.

85.    Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, Alight, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (e.g., website, call center, and some print services).

86.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 2.    The Plan's Recordkeeper Offered Routine Services

87.    The RKA services performed for the Plan from 2019 through 2021, when Great-West Life & Annuity Ins. Co. ("Great-West") was the recordkeeper, were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 15, 37, 50, 64. Below is a description of the recordkeeping codes:

> 15 - Recordkeeping and information management (computing, tabulating, data processing etc.)
>
> 37 – Participant loan processing
>
> 50 – Direct payment from the plan
>
> 64 – Recordkeeping fees

*See* Instructions for the 2023 Schedule C (Form 5500) available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf at 27-31.

88.    Again, the above services are not out of the ordinary of the services other national recordkeepers provide. Any fees associated with other ancillary a la carte services performed by the recordkeeper would be negligible because it is on a participant-by-

participant basis instead of plan-wide.

89.     Further, Plan sponsors have great discretion and essentially no guidance in selecting the recordkeeping codes for the Schedule C. See Instructions for the 2023 Schedule C (Form 5500) at 30 ("Select from the list below all codes that describe both the kind of services provided and the type of compensation received. Enter as many codes as apply").

90.     The service codes identified on Schedule C are often unreliable because of inconsistencies in how the codes are interpreted and applied by different service providers. For example, all recordkeepers provide recordkeeping and information management, as well as communications to plan participants. However, Capital Group did not identify service code 15 – "Recordkeeping and information management (computing, tabulating, data processing, etc.)" or service code 38 - "Participant communication" on the Schedule C throughout the Class Period.

91.     These inconsistencies regarding services provided to a plan make it difficult to compare services across different plans.

92.     Most recordkeepers, including Great-West, are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

### 3.     There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period

93.     As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

94.     Here, the fact that the Plan paid the relatively same amount of excessively high recordkeeping fees from 2019 to 2021, there is little to suggest that Defendants conducted an RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could

obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

95.    Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

**E.    The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans**

96.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

97.    As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since well before the start of the Class Period and up to at least 2021.

| Plan Year | Recordkeeper | Participants | Schedule C Codes | Total RKA Reported[13] | PP$ |
|---|---|---|---|---|---|
| 2021 | Great-West | 7,419 | 15, 37, 50, 64 | $941,194 | $126.86 |
| 2020 | Great-West | 7,675 | 15, 37, 50, 64 | $409,054 | $53.30 |
| 2019 | Great-West | 9,641 | 15, 37, 50, 64 | $1,191,589 | $123.60 |
| 2018 | Great-West | 10,570 | 15, 37, 50, 64 | $1,179,391 | $111.58 |
| 2017 | Great-West | 10,653 | 15, 64 | $492,351 | $46.22 |
| 2016 | Great-West | 10,124 | 15, 64 | $448,113 | $44.26 |
| 2015 | Great-West | 9,642 | 15, 64 | $1,388,436 | $144.00 |
| 2014 | Putnam Investor Services, Inc. ("Putnam") | 12,420 | 15, 64 | $559,054 | $45.01 |
| 2013 | Putnam | 11,999 | 15, 64 | $536,621 | $44.72 |

---

[13] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 15, 37, 50, 64. Excluded from these amounts are any amounts reported as, including but not limited to, trustee, legal, accounting and/or consulting fees. Although no indirect costs are reported it is expected that once the total amount of revenue sharing is known this amount will increase.

98. The above fees were astronomical when benchmarked against similar plans.

99. At all times during the Class Period a per participant fee in excess of $53 (the lowest per participant fee from 2019-2021) was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be. To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 403(b) data is BrightScope/ICI. It categorizes plans in the following tranches:

EXHIBIT I.4

**Audited ERISA 403(b) Plans and the Universe of ERISA 403(b) Plans by Plan Assets**
Distribution of 403(b) plans, participants, and assets by plan assets; 2019

| Plan assets | BrightScope audited 403(b) filings | | | Department of Labor 403(b) universe | | |
| | Plans | Participants Thousands | Assets Billions of dollars | Plans | Participants Thousands | Assets Billions of dollars |
|---|---|---|---|---|---|---|
| Less than $1M | 227 | 48.1 | $0.1 | 7,193 | 209.3 | $2.6 |
| $1M to $10M | 2,583 | 705.2 | 12.3 | 7,304 | 987.9 | 26.1 |
| >$10M to $50M | 2,069 | 860.1 | 48.2 | 2,329 | 907.1 | 52.4 |
| >$50M to $100M | 518 | 433.9 | 36.5 | 536 | 450.8 | 37.7 |
| >$100M to $250M | 432 | 754.9 | 67.4 | 440 | 781.4 | 68.7 |
| >$250M to $500M | 191 | 751.8 | 67.7 | 196 | 785.6 | 69.2 |
| >$500M to $1B | 111 | 759.5 | 77.9 | 115 | 801.4 | 81.1 |
| More than $1B | 108 | 2,092.0 | 262.5 | 109 | 2,121.6 | 264.0 |
| All plans | 6,239 | 6,405.6 | 572.6 | 18,222 | 7,045.1 | 601.8 |

Note: Audited 403(b) filings generally include plans with 100 participants or more. Assets are fair market value at the year-end of the plan and include loans.
Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-04/23-ppr-dcplan-profile-403b.pdf.

100. Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own.

101. Looking at recordkeeping costs for plans similar in size to the assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[14] |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | $939,399,569 | 18,674 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $25 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37 60 64 65 71 | Yes - $0 | $35 |
| **Great-West** | **NortonLifeLock Section 401(k) Plan** | **2019** | **$1,241,884,655** | **9,641** | **15 37 50 64** | **No** | **$124** |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| Great-West | Viacom 401(k) Plan | 2020 | $1,747,213,865 | 12,469 | 15 37 50 64 | No | $37 |
| **Great-West** | **NortonLifeLock Section 401(k) Plan** | **2020** | **$1,134,808,556** | **7,675** | **15 37 50 64** | **Yes - $0** | **$53** |
| Vanguard | Crowe LLP Retirement Plan | 2021 | $1,021,351,197 | 6,840 | 15 33 37 99 | Yes - $0 | $27 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |

---

[14] Unless otherwise noted, these fees are taken from the Form 5500.

CLASS ACTION COMPLAINT

| Fidelity | PG&E Corporation Retirement Savings Plan | 2021 | $4,285,161,000 | 12,994 | 37 64 65 71 | No | $33 |
| **Great-West** | **NortonLifeLock Section 401(k) Plan** | **2021** | **$1,246,829,291** | **7,419** | **15 37 50 64** | **Yes - $0** | **$127** |

102.    The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees from 2019 through 2021.

103.    As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $101 average per participant fee from 2019 to 2021 is more than double the average fee of $25 per participant from 2019 to 2021 for the sixteen (16) plans listed above.

104.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2021. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2021.

105.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $25 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

106.    Given the size of the Plan's assets and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost since the beginning of the Class Period.

## VII.    THE COMPANY IMPROPERLY REDUCED ITS PLAN CONTRIBUTIONS THROUGH FORFEITURES

107.    During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Defendants' own benefit and to the detriment of Plan participants.

108.    Defendants have improperly used forfeited non-vested Plan assets since at least

the beginning of the Class Period for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit Plan participants.

109.    According to information from the Plan's Form 5500, the following represents the balance in the Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset Gen Digital's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Plan Year | Forfeiture Amount | Amts. Used to Offset Employer Contributions | Amts Used to Pay Admin Costs |
|---|---|---|---|
| 2019 | $400,000 | $771,000 | $0 |
| 2020 | $970,000 | $2,889,000 | $0 |
| 2021 | $990,000 | $757,000 | $0 |
| 2022 | $1,564,000 | $915,000 | $0 |
| 2023 | $140,000 | $1,364,000 | $0 |
| Total | | $6,696,000 | $0 |

110.    Based on the above chart, from the beginning of the Class Period through 2023, over $6 million was improperly steered from paying RKA costs and instead used to benefit the Company.

111.    Defendants effectively placed their own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur at least $6 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

112.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

113.    At all relevant times, the Committee and its members during the Class Period

("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

114.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

115.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint, including mismanagement of investment funds and failing to control the costs of the Plan's recordkeeping and administrative costs.

116.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

117.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

118.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of Fiduciary Duty of Loyalty**

**(Asserted against Gen Digital, the Committee and Board Defendants)**

119.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.     At all relevant times, the Company, the Committee and its members during the Class Period, and the Board and its members during the Class Period ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

121.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

122.     Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

123.     The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

124.     The Loyalty Defendants used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

125.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

126.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer

1    for Relief.

2    127.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under

3    29 U.S.C. § 1105(a).

4                                          **COUNT III**
                        **Breach of ERISA's Anti-Inurement Provision**
5              **(Asserted against Gen Digital and the Board Defendants)**

6    128.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in

7    this Complaint as if fully set forth herein.

8    129.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the

9    benefit of any employer and shall be held for the exclusive purpose of providing benefits to

10   participants in the plan and their beneficiaries and defraying reasonable expenses of

11   administering the plan."

12   130.    Because all forfeited Plan participant funds are initially placed in the Plan's

13   trust, these forfeited funds are Plan assets.

14   131.    The Companies' use of the forfeited funds to defray its own contributions to the

15   Plan in order to save itself millions of dollars in funds that the Company would otherwise

16   have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the

17   Company in violation of 29 U.S.C. § 1103(c)(1).

18   132.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are

19   liable to restore to the Plan all losses caused by their breaches of ERISA's anti-inurement

20   provision, and also must restore any profits resulting from such breaches. In addition,

21   Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches

22   as set forth in their Prayer for Relief.

23   133.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under

24   29 U.S.C. § 1105(a).

25                                          **COUNT IV**
                    **Failure to Adequately Monitor Other Fiduciaries**
26              **(Asserted against Gen Digital and the Board Defendants)**

27   134.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in

28   this Complaint as if fully set forth herein.

135.    Gen Digital and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

136.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

137.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

138.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

    (b)    failing to monitor the processes by which Plan investments were evaluated; and

    (c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and the Plan participants' retirement savings.

139.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their

1  fiduciary obligations, the Plan would not have suffered these losses, and Plan participants
2  would have had more money available to them for their retirement.

3      140.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants
4  are liable to restore to the Plan all losses caused by their failure to adequately monitor the
5  Committee Defendants.   In addition, Plaintiffs are entitled to equitable relief and other
6  appropriate relief as set forth in their Prayer for Relief.

7                          **PRAYER FOR RELIEF**

8      **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all
9  claims and requests that the Court award the following relief:

10      A.    A determination that this action may proceed as a class action under Rule
11  23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

12      B.    Designation of Plaintiffs as Class Representatives and designation of
13  Plaintiffs' counsel as Class Counsel;

14      C.    A Declaration that the Defendants, and each of them, have breached their
15  fiduciary duties under ERISA;

16      D.    An Order compelling the Defendants to make good to the Plan all losses
17  to the Plan resulting from Defendants' breaches of their fiduciary duties, including
18  losses to the Plan resulting from imprudent investment of the Plan's assets, and to
19  restore to the Plan all profits the Defendants made through use of the Plan's assets, and
20  to restore to the Plan all profits which the participants would have made if the
21  Defendants had fulfilled their fiduciary obligations;

22      E.    An order requiring the Company Defendants to disgorge all profits
23  received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C.
24  § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust,
25  or a surcharge against the Company Defendant as necessary to effectuate said relief,
26  and to prevent the Company Defendant's unjust enrichment;

27      F.    For statutory penalties in an amount to be determined at trial, pursuant
28  to 29 U.S.C. § 1132(c)(1), 29 U.S.C. § 1024(b)(4), and 29 C.F.R. § 2575.502c-1;

G. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

J. An award of pre-judgment interest;

K. An award of costs pursuant to 29 U.S.C. § 1132(g);

L. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

M. Such other and further relief as the Court deems equitable and just.

Dated:  August 4, 2025

*/s/ Jay F. Parmelee*
Jay F. Parmelee (Atty. ID #034477)
DENTON PETERSON DUNN
1930 N. Arboleda, Suite 200
Mesa, AZ  85213
Telephone: (480) 325-9900
Fax: (480) 325-9901
Email: Jay@dentonpeterson.com

Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Pro Hac Vice* to be requested)
James Maro, Esquire
PA Attorney ID # 86420
(*Pro Hac Vice* to be requested)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Telephone:  (610) 890-0200
Fax:  (717) 232-3080
Email: markg@capozziadler.com
          jamesm@capozziadler.com

*Counsel for Plaintiffs and the Putative Class*

**CONSENT TO JOIN COLLECTIVE ACTION AS NAMED PLAINTIFF**

    I, Jamin Bracken, do hereby consent to be a party plaintiff to the above-entitled action. I have read the Complaint to be filed in the United States District Court for the District of Arizona, Phoenix Division, and authorize my attorney, Jay Parmelee of Denton Peterson Dunn, PLLC, to file the Complaint on my behalf and for other employees similarly situated.

Date: 8/4/2025

Signed by:

*Jamin Bracken*
2AD5872E9249462

Jamin Bracken

Docusign Envelope ID: DB36E14A-FEE7-41D8-AED0-4E16AB95BC43

**CONSENT TO JOIN COLLECTIVE ACTION AS NAMED PLAINTIFF**

I, Scott Wolstenholm, do hereby consent to be a party plaintiff to the above-entitled action. I have read the Complaint to be filed in the United States District Court for the District of Arizona, Phoenix Division, and authorize my attorney, Jay Parmelee of Denton Peterson Dunn, PLLC, to file the Complaint on my behalf and for other employees similarly situated.

Date: 8/4/2025

Scott Wolstenholm

## CONSENT TO JOIN COLLECTIVE ACTION AS NAMED PLAINTIFF

      I, Trent Lyght, do hereby consent to be a party plaintiff to the above-entitled action. I have read the Complaint to be filed in the United States District Court for the District of Arizona, Phoenix Division, and authorize my attorney, Jay Parmelee of Denton Peterson Dunn, PLLC, to file the Complaint on my behalf and for other employees similarly situated.

Date:   8/4/2025

                                     *Trent Lyght*
                                     E5C92585B13E456

                                   Trent Lyght

**CONSENT TO JOIN COLLECTIVE ACTION AS NAMED PLAINTIFF**

     I, Deborah Northcutt, do hereby consent to be a party plaintiff to the above-entitled action. I have read the Complaint to be filed in the United States District Court for the District of Arizona, Phoenix Division, and authorize my attorney, Jay Parmelee of Denton Peterson Dunn, PLLC, to file the Complaint on my behalf and for other employees similarly situated.

Date: _8/4/2025_____

Deborah Northcutt