Jay F. Parmelee (Atty. ID #034477)
**DENTON PETERSON DUNN**
1930 N. Arboleda, Suite 200
Mesa, AZ 85213
Telephone: (480) 325-9900
Fax: (480) 325-9901
Email: Jay@dentonpeterson.com

*Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Deborah Northcutt, Jamin Bracken, Scott Wolstenholm and Trent Lyght, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Gen Digital Inc., f/k/a NortonLifeLock Inc., f/k/a Symantec Corporation, The Board of Directors of Gen Digital Inc., The Employee Benefits Administrative Committee ("Board"), and John Does 1-30,<br><br>Defendants. | CASE NO. 2:25-cv-02768-DWL<br><br>**AMENDED CLASS ACTION COMPLAINT**[1] |

---

[1] Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

Plaintiffs, Deborah Northcutt, Jamin Bracken, Scott Wolstenholm, and Trent Lyght ("Plaintiffs"), by and through their attorneys, on behalf of the Gen Digital Inc. 401(k) Plan (formerly known as the NortonLifeLock Section 401(k) Plan, formerly known as the Symantec Corporation Section 401(k) Plan)[2] (the "Plan"),[3] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Gen Digital Inc., f/k/a NortonLifeLock Inc., f/k/a Symantec Corporation ("Gen Digital" or the "Company"), the Board of Directors of the Company ("Board"), and the Employee Benefits Administrative Committee (the "Committee") for breaches of their fiduciary duties.

2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

3.     The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a

---

[2] "Effective November 4, 2019, the Plan, shall be renamed the 'NortonLifeLock 401(k) Plan' and all references to the 'Symantec Corporation Section 401(k) Plan' therein shall be replaced with references to the 'NortonLifeLock 401(k) Plan.'" Ninth Amendment to the Symantec Corporation Section 401(k) Plan, at 1; *see also* Fourteenth Amendment to the NortonLifeLock 401(k) Plan, at 1 ("The name of the Plan shall be changed to the 'Gen Digital Inc. 401(k) Plan,' effective as of November 7, 2022."). The Symantec Corporation Section 401(k) Plan, as amended and restated, effective as of January 1, 2015, and any Amendments thereafter will be referred to as "Plan Document" or "Plan Doc."

[3] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and their participants.

prudent process for selecting investment options and service providers," including providers of the Plan's administrative and recordkeeping ("RKA") services.[4]

4.    With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[5]

5.    Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.    At all times during the Class Period, the Plan had about $1 billion in assets under management. At the Plan's fiscal year end in 2019, the Plan had $1,241,884,655 in assets under management that were entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan ("2019 Form 5500") at Schedule H, p. 2. At the Plan's fiscal year end in 2023, the Plan had $995,825,175 in assets under management. *See* 2023 Form 5500 at Schedule H, p. 2.

7.    The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of Plans in the country had more than $1 billion in assets under management. In 2019, at the start of the Class Period, only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[6]  The Plan's assets under management makes it among the largest plans in the United States.

8.    As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan,

---

[4] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited November 21, 2024).

[5] *Id.*

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's RKA costs.

9. The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA and managed account services. The Plan's fiduciaries, however, did not try to reduce the Plan's expenses to ensure they were prudent. Rather, the Plan's fiduciaries allowed unreasonable expenses to be charged to participants for RKA services and managed account services.

10. From at least 2015 until 2021, Defendants caused the Plan to enter into an arrangement with Great-West Life & Annuity Insurance ("Great-West"), who was a party-in-interest engaging in party-in-interest transactions. Specifically, Great-West received millions of dollars in exchange for recordkeeping services and Great-West's affiliate, Great-West Trust Company LLC, received compensation for acting as trustee and custodian for the Plan. *See* Report of Independent Auditors ("Auditor's Report") Note 1, attached to 2015-2021 Form 5500s for the Plan ("The Company has contracted with the Great-West Trust Company LLC (Great-West) to act as the trustee and custodian, and an affiliate of Great-West to process and maintain the records of participant data. The Plan pays substantially all of the Plan's expenses."). This arrangement and transactions with Great-West are prohibited transactions because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

11. From 2022 until at least 2024, Defendants caused the Plan to enter into an arrangement with Fidelity Investments Institutional ("Fidelity"), who was a party-in-interest engaging in party-in-interest transactions. Specifically, Fidelity received millions of dollars in exchange for recordkeeping services and Fidelity's affiliate, Fidelity Management Trust Company, received compensation for acting as trustee and custodian for the Plan. *See* Auditor's Report Note 1, attached to 2022-2024 Form 5500s for the Plan ("The Company has contracted with Fidelity Management Trust Company (Fidelity) to act as the trustee and

custodian, and an affiliate of Fidelity to process and maintain the records of participant data. The Plan pays substantially all the Plan's expenses.").

12.    The arrangements and transactions with Great-West and Fidelity are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

13.    Plaintiffs also allege that Defendants breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds to reduce employer contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs. This action by the Defendants was a clear breach of the duty of prudence to Plan participants and cost Plan participants millions of dollars.

14.    During the putative Class Period, Defendants, as the "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (1) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C); and (2) failing to defray reasonable expenses of administering the Plan.

15.    Defendants' actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

16.    Based on this conduct, Plaintiffs assert claims against Defendants for violation of ERISA's prohibited transactions concerning Great-West (Count I), violation of ERISA's prohibit transactions concerning Fidelity (Count II), breach of the fiduciary duty of prudence (Count III), and failure to monitor fiduciaries (Count IV).

## II.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to

29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

18.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### A.     Plaintiffs

20.     Plaintiff, Deborah Northcutt ("Northcutt"), resides in Casa Grande, Arizona. During her employment, Plaintiff Northcutt participated in the Plan paying the fees associated with her Plan account and was subject to the excessive RKA costs. Plaintiff Northcutt suffered injury to her Plan account by paying excessive RKA costs. Plaintiff Northcutt also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative costs which, if used to pay for administrative costs, would have reduced or eliminated the amounts charged to Plaintiff Northcutt's individual account to pay for the administrative costs.

21.     Plaintiff, Jamin Bracken ("Bracken"), resides in Sacramento, California. During his employment, Plaintiff Bracken participated in the Plan paying the fees associated with his Plan account and was subject to the excessive RKA costs. Plaintiff Bracken suffered injury to his Plan account by paying excessive RKA costs.  Plaintiff Bracken also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative costs which, if used to pay for administrative costs, would have reduced or eliminated the amounts charged to Plaintiff Bracken's individual account to pay for the administrative costs.

22.     Plaintiff, Scott Wolstenholm ("Wolstenholm"), resides in San Jose, California. During his employment, Plaintiff Wolstenholm participated in the Plan paying the fees associated with his Plan account and was subject to the excessive RKA costs. Plaintiff Wolstenholm suffered injury to his Plan account by paying excessive RKA costs. Plaintiff Wolstenholm also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay administrative costs which, if used to pay for administrative costs, would have reduced or eliminated the amounts charged to Plaintiff Wolstenholm's individual account to pay for the administrative costs.

23.     Plaintiff, Trent Lyght ("Lyght"), resides in Alpharetta, Georgia. During his employment, Plaintiff Lyght participated in the Plan paying the fees costs associated with his Plan account and was subject to the excessive RKA costs. Plaintiff Lyght suffered injury to his Plan account by paying excessive RKA costs. Plaintiff Lyght also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative costs which, if used to pay for administrative costs, would have reduced or eliminated the amounts charged to Plaintiff Lyght's individual account to pay for the administrative costs.

24.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct.

25.     Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

26.     Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**B.     Defendants**

**<u>Company Defendant</u>**

AMENDED CLASS ACTION COMPLAINT

27.    Gen Digital is the Plan Sponsor for the Plan with a principal place of business at 60 E. Rio Salado Parkway, Tempe, Arizona. *See* 2023 Form 5500 for the Plan, at 1.[7] According to its website, Gen Digital "is a global company dedicated to powering Digital Freedom through its trusted consumer brands including Norton, Avast, LifeLock, MoneyLion and more."[8]

28.    As a fiduciary of the Plan, Gen Digital exercised discretionary authority over the disposition of Plan assets, specifically the disposition of forfeiture amounts. *See* Plan Doc. at 47 ("Upon such Forfeiture, the Sponsoring Company shall determine, in its sole discretion, whether the Non-Vested Amount shall be used to reduce Matching Contributions to the Plan, or whether the Non-Vested Amount shall be used to pay administrative expenses of the Plan.").

29.    "The initial appointment of Committee members and any subsequent appointment upon the occurrence of a vacancy of a member of the Committee shall be made by the Board of Directors of the Sponsoring Company." Plan Doc., at 17; *see also* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 8 ("The Company has appointed the Gen Digital Inc. Employee Benefits Administrative Committee (the "Committee") to manage the operation and administration of the Plan.").

30.    The Company appointed the Committee to, among other things, prudently manage the Plan, including overseeing the fees paid by the Plan and its participants. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[7] As discussed above, the defined term Gen Digital or Company refers to Gen Digital Inc. who was the Plan Sponsor effective November 7, 2022. On November 7, 2022, NortonLifeLock Inc. was renamed Gen Digital Inc. NortonLifeLock Inc. was the Plan sponsor from November 4, 2019 to November 6, 2022. Effective November 4, 2019, Symantec Corporation was renamed NortonLifeLock Inc. Prior to November 4, 2019, Symantec Corporation was the Plan Sponsor.

[8] *See* https://www.gendigital.com/us/en/ last accessed on November 21, 2025.

31. Accordingly, during the putative Class Period, Gen Digital is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

32. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

33. Gen Digital, acting through its Board,[9] appointed the Committee. Accordingly, like the Company, the Board had a concomitant fiduciary duty to monitor and supervise the Committee.

34. Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

35. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

36. As discussed above, Gen Digital and the Board appointed the members of the Employee Benefits Administrative Committee to manage the Plan. As will be discussed below, the Employee Benefits Administrative Committee fell well short of these fiduciary goals.

37. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A)

---

[9] For the period prior to November 4, 2019, the defined term Board shall refer to the Board of Directors of Symantec Corporation. For the period from November 4, 2019 to November 6, 2022, the defined term Board shall refer to the Board of Directors of NortonLifeLock Inc. And for periods subsequent to November 7, 2022, the defined term Board shall refer to the Board of Directors of Gen Digital Inc. or a related entity having a board of directors that acts in that capacity or a similar capacity for Gen Digital Inc.

because each exercised discretionary authority over management or disposition of the Plans' assets.

38.    "The Committee shall be responsible for the administration of the Plan, in accordance with the provisions of Section 5 of the Plan." Plan Doc., at 16.

39.    "'Plan Administrator' shall mean the Committee." Second Amendment to the Plan Doc., at 1.

40.    The Plan Administrator's responsibilities include, "Adopt such policies, rules and regulations as it may deem necessary or desirable, in order to carry out the provisions of the Plan and the Trust and to comply with the requirements of ERISA and the Internal Revenue Code; provided, however, that the Committee, and not the Plan Administrator, shall have the power and duty to adopt a funding and investment policy, as set forth in Section 5 of the Plan." Plan Doc., at 16-17.

41.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

42.    To the extent that there are additional officers, employees and/or contractors of Gen Digital who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager or consultant for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Gen Digital officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS[10]

---

[10] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting

43. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[11]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of Gen Digital Inc. 401(k) Plan (formerly known as the NortonLifeLock 401(k) Plan, formerly known as the Symantec Corporation Section 401(k) Plan) at any time between August 4, 2019 through the date of judgment (the "Class Period").

44. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 6,226 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

45. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

46. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence

by engaging in the conduct described herein;

---

plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[11] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.  Whether Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.  The proper form of equitable and injunctive relief; and

E.  The proper measure of monetary relief.

47.  Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

48.  This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.  In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.  THE PLAN

50.  The Plan is a defined contribution plan covering substantially all eligible employees of Gen Digital. *See* Plan Doc., at 2 ("This Plan is intended to qualify as a defined contribution plan with an employer matching contribution and a cash-or-deferred feature."); *see also* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 8 ("The Plan is a defined contribution plan that was established on January 1, 1988, by Gen Digital Inc. (the

Company), formerly known as NortonLifeLock Inc. to provide benefits to eligible employees, as defined in the Plan Document.").

51.     "[T]he purpose of the Plan is to provide benefits for Participants and their Beneficiaries as a result of the death, Disability or other Termination of Employment of such Participants." Plan Doc., at 2.

### *Eligibility*

52.     In general, the Plan covers substantially all employees of Gen Digital from the first day of employment. *See* Plan Doc. at 15 ("Each individual who becomes an Employee on or after January 1, 2006 shall be eligible to participate in the Plan immediately after completing one Hour of Service"); *see also* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 11 ("Employees of the Company are eligible to participate in the Plan immediately upon hire, as soon as administratively feasible.").

### *Contributions*

53.     "[E]ach Eligible Participant may elect to have a percentage (in multiples of one percent (1%), but not exceeding fifty percent (50%)) of his Compensation for such Plan Year contributed to the Trust on a salary-reduction basis in an amount not to exceed the 'applicable dollar amount' (as provided in Section 402(g)(1)(B) of the Internal Revenue Code) for the calendar year." Plan Doc., at 21; *see also* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 11 ("Participants may elect to have the Company contribute their eligible pre-tax or after- tax compensation to the Plan up to the amount allowable under the Plan Document and current income tax regulations.").

54.     The Plan also permits the automatic enrollment of eligible employees in the Plan. *See* Tenth Amendment to the Plan, at 1 ("In the case of an Eligible Participant who is hired or rehired by a Participating Company on or after *January 1, 2012*, and who fails to make an affirmative election of Elective Deferral Contributions … within thirty (30) days following the eligibility date specified in Section 3.1(c), the Eligible Participant shall be deemed to have elected, effective as of the first payroll period beginning after such thirtieth (30th) day … to make Elective Deferral Contributions of four percent (4%) of an Eligible

Participant's Compensation as a default contribution percentage in the absence of an Elective Deferral Contribution election (referred to herein as an "Automatic Contribution")").

55. The Plan allows participants to make catch-up contributions (Plan Doc., at 23-24) and Roth elective deferral contributions (*id*., at 24).

56. The Plan also provides for employer matching contributions.

57. "The Participating Companies shall make Matching Contributions for each payroll period, on behalf of each Eligible Participant who makes an Elective Deferral Contribution for such payroll period, equal to fifty cents ($.50) for each one dollar ($1) of any Elective Deferral Contributions made by such Eligible Participant, up to six percent (6%) of such Eligible Participant's compensation for such payroll period." Plan Doc., at 25.

58. Like other companies that sponsor 401(k) and 403(b) plans for their employees, Gen Digital enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 403(b) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

59. Gen Digital also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

60. Given the size of the Plan, Gen Digital likely enjoyed significant tax and cost savings from offering a match.

***Vesting***

61. Participants are automatically vested in any contributions they made to their accounts themselves. *See* Plan Doc., at 45 ("A Participant is fully vested in his Elective Deferral Contributions Account, his Catch-Up Contributions Account, his Rollover Account, his Transfer Contributions Account and his Roth Elective Deferral Contributions Account at all times.").

62.     A Participant's Matching Contributions Account shall be subject to the following vesting schedule based upon the date on which Matching Contributions were credited to such Account and upon the number of Years of Service that the Participant has completed as of the date of his Termination of Employment:

| Years of Service | Vesting Percentage |
| --- | --- |
| 0 | 0% |
| 1 | 25% |
| 2 | 50% |
| 3 | 75% |
| 4 | 100% |

Plan Doc., at 45-46.

***Forfeiture***

63.     "Upon the Termination of Employment of a Participant who has not become fully vested, who has not incurred a Disability, or who has not attained Early Retirement or Normal Retirement, the amounts in such Participant's Matching Contributions Account, minus the Vested Interest in such Matching Contributions Account … shall be treated as having been forfeited." Plan Doc., at 47.

64.     "Upon such Forfeiture, the Sponsoring Company shall determine, in its sole discretion, whether the Non-Vested Amount shall be used to reduce Matching Contributions to the Plan, or whether the Non-Vested Amount shall be used to pay administrative expenses of the Plan." *Id*.

65.     Throughout the Class Period, the Company chose to use funds in the forfeiture account to offset employer matching contributions.

***Payment of Plan Expenses***

66.     "The Plan pays substantially all the Plan's expenses." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 8.

**VI.     DEFENDANTS COMMITTED A PROHIBITED TRANSACTION RESULTING IN EXCESSIVE RKA COSTS FOR THE PLAN AND ITS PARTICIPANTS**

67.     During the Class Period, Defendants entered into a contract with Great-West and Fidelity to provide RKA services. However, such engagements and subsequent services provided by Great-West and Fidelity constitute prohibited transactions under ERISA.

68.     29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

69.     Here, Great-West and Fidelity were parties in interest to the Plan as they were receiving compensation for RKA services, as well as compensation from trustee services from the Plan. Fidelity was also receiving compensation from fees for investments it offered in the Plan.

**A.     Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants**

70.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

71.     There are two essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.     Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.     Multi-channel participant and plan sponsor access (e.g. phone, web);

C.     Daily participant transaction accounting (e.g., purchases, redemptions,

exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

72. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

73. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

- 17 -
AMENDED CLASS ACTION COMPLAINT

d.    Processing of qualified domestic relations orders.

74.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

75.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant***.

76.    Recordkeepers such as Fidelity and Empower, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (e.g., website, call center, and some print services).

77.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

**2.    The Plan's Recordkeeping Fees to Great-West were Excessive**

78.    As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since well before the start of the Class Period and up to at least 2021.

79.    The Plan's per participant RKA fees were as follows:

| Plan Year | Recordkeeper | Participants | Total RKA Reported | PP$ |
|---|---|---|---|---|
| 2021 | Great-West | 7,419 | $941,194 | $126.86 |
| 2020 | Great-West | 7,675 | $409,054 | $53.30 |
| 2019 | Great-West | 9,641 | $1,191,589 | $123.60 |
| 2018 | Great-West | 10,570 | $1,179,391 | $111.58 |
| 2017 | Great-West | 10,653 | $492,351 | $46.22 |
| 2016 | Great-West | 10,124 | $448,113 | $44.26 |
| 2015 | Great-West | 9,642 | $1,388,436 | $144.00 |

80.     Looking at recordkeeping costs for plans similar in size to the assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[12] |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | $939,399,569 | 18,674 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $25 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37 60 64 65 71 | Yes - $0 | $35 |
| **Great-West** | **NortonLifeLock Section 401(k) Plan** | **2019** | **$1,241,884,655** | **9,641** | **15 37 50 64** | **No** | **$124** |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| Great-West | Viacom 401(k) Plan | 2020 | $1,747,213,865 | 12,469 | 15 37 50 64 | No | $37 |
| **Great-West** | **NortonLifeLock Section 401(k) Plan** | **2020** | **$1,134,808,556** | **7,675** | **15 37 50 64** | **Yes - $0** | **$53** |
| Vanguard | Crowe LLP Retirement Plan | 2021 | $1,021,351,197 | 6,840 | 15 33 37 99 | Yes - $0 | $27 |

[12] Unless otherwise noted, these fees are taken from the Form 5500.

AMENDED CLASS ACTION COMPLAINT

| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2021 | $4,285,161,000 | 12,994 | 37 64 65 71 | No | $33 |
| **Great-West** | **NortonLifeLock Section 401(k) Plan** | **2021** | **$1,246,829,291** | **7,419** | **15 37 50 64** | **Yes - $0** | **$127** |

81.    The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees from 2019 to 2021.

82.    The Plan's $101 average per participant fee from 2019 to 2021 is more than quadruple the average fee of $25 per participant from 2019 to 2021 for the thirteen (13) plans listed above.

83.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2021. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2021.

84.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $25 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

85.    Because Great-West was a party-in-interest, the Plan's fiduciaries should have taken the additional sources of income paid to Great-West into consideration to reduce the excessive RKA fees paid to Great-West.

86.    For the foregoing reasons, Defendants' violation of ERISA's prohibited transactions resulted in Plan participants paying excessive RKA fees to Great-West.

**3.    The Plan's Recordkeeping Fees to Fidelity were Excessive**

87.    During the 2022 Plan year, the Plan's recordkeeper changed, and the Plan's recordkeeping services were provided by Fidelity.

88.    Similar to Great-West, the recordkeeping fees charged by Fidelity were

AMENDED CLASS ACTION COMPLAINT

excessive.

89. For example, and per the 2024 Form 5500 for the Plan, in 2024 the per participant recordkeeping fee was $41.58, far greater than the $25 per participant fee the Plan could have obtained.

90. Like Great-West, Fidelity was a party-in-interest. Fidelity not only received compensation for services provided as the Plan's recordkeeper, Fidelity also received compensation for providing trustee services, and also received compensation from fees for Fidelity investments offered in the Plan.

91. Further, because Fidelity was a party-in-interest, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Fidelity.

92. For the foregoing reasons, Defendants' violation of ERISA's prohibited transactions resulted in Plan participants paying excessive RKA fees to Fidelity.

## VII. THE COMPANY IMPROPERLY REDUCED ITS EMPLOYER CONTRIBUTIONS THROUGH FORFEITURES

93. During the Class Period, the Company breached its ERISA fiduciary duties by failing to implement and/or adhere to a prudent process to consider and determine the fair and reasonable utilization of Plan assets, namely forfeitures, and by misusing forfeitures for the Company's own benefit and to the detriment of Plan participants.

94. As with any exercise of discretion by Plan fiduciaries, the Company had an obligation to Plan participants to prudently and loyally determine how to utilize forfeitures. At the discretion of the Company, in its fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan.

95. In an effort to discover information about the establishment and operation of the Plan, Plaintiffs sent a written request pursuant to Section 104(b)(4) of ERISA to the Plan administrator on August 27, 2024.

96. By correspondence dated September 27, 2024, the Plan administrator provided certain documents. None of the documents or information provided by the Plan administrator

demonstrated that the Company employed a deliberative process regarding the disposition of the Plan's forfeitures.

97.     On December 23, 2024, the Plan administrator supplemented its production of documents pursuant to Plaintiffs request. The additional documents provided by the Plan administrator still did not demonstrate that the Company employed a prudent, deliberative process regarding the disposition of the Plan's forfeitures.

98.     Using forfeitures to pay Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

99.     In deciding between using forfeitures to benefit the Company or using forfeitures to benefit the participants, the Company is presented with a conflict of interest in administering the Plan and managing and disposing of the Plan's assets.

100.    Despite the conflict of interest presented by this decision, the Company failed to undertake any investigation into which option was in the best interest of the Plan's participants and beneficiaries.

101.    The Company did not, for example, investigate whether there was a risk that the Company would be unable to satisfy its contribution obligations if forfeitures were used to pay Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's expenses charged to participants and still offset a portion of the Company's own contribution obligations, as a prudent person would have done.

102.    The Company also failed to consult with an independent, non-conflicted decision-maker, or an independent fiduciary, to advise it in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

103.    ERISA requires fiduciaries to manage the Plan's assets solely in the interest of participants. At all times relevant, the Plan permitted forfeitures to be used to pay Plan expenses, which otherwise would be charged to participants. The Company consistently declined to use the Plan's assets for such purpose during the putative Class Period. Since at least the beginning of the Class Period, the company never allocated even a single dollar of

AMENDED CLASS ACTION COMPLAINT

forfeitures to be used to offset Plan expenses being charged to participants. The Company has used every dollar of forfeitures to save the out-of-pocket costs to the Company of making the employer contributions to the Plan.

104.    The Company has improperly used forfeited non-vested Plan assets for the Company's benefit to reduce future employer contributions instead of using the funds to benefit Plan participants.

105.    According to the Plan's Form 5500s, the following represents the annual forfeitures and the the amount of the forfeitures used to offset the Company's contributions to the Plan, while allocating zero dollars to offset Plan administration costs being paid by the participants.

| Plan Year | Forfeiture Amount | Amts. Used to Offset Employer Contributions | Amts Used to Pay Admin Costs |
|---|---|---|---|
| 2019 | $400,000 | $771,000 | $0 |
| 2020 | $970,000 | $2,889,000 | $0 |
| 2021 | $990,000 | $757,000 | $0 |
| 2022 | $1,564,000 | $915,000 | $0 |
| 2023 | $140,000 | $1,364,000 | $0 |
| 2024 | Unknown | Unknown | Unknown |
| Total | $4,064,000 | $6,696,000 | $0 |

106.    The Company failed to implement/adhere to a prudent process to ensure that the forfeitures, which constitute Plan assets, were fairly and reasonably utilized.

107.    The Company lacked any process to assess the options for applying forfeitures and put its own interests in saving out-of-pocket costs above the interests of the Plan and its participants.

108.    The Company failed to consider any guidance, benchmarks, or best practices that a prudent fiduciary would review. In short, the Company failed to exercise any discernible process whatsoever.

109.    By failing to perform its fiduciary responsibilities, the Company allowed substantial Plan assets to be mishandled. As a result, the Plan and its participants suffered

harm, including but not limited to increased costs and diminished account values.

## COUNT I
### Prohibited Transactions
### (Against All Defendants Concerning Great-West)

110.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

111.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

112.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

113.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

114.    Defendants' decision to agree to pay excessive fees to Great-West as recordkeeper from 2019 to 2021 for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

115.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## COUNT II
### Prohibited Transactions
### (Against All Defendants Concerning Fidelity)

116.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in

this Complaint as if fully set forth herein.

117.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

118.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

119.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

120.    Defendants' decision to agree to pay excessive fees to Fidelity as recordkeeper from 2022 to at least 2024 for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

121.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**COUNT III**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Company)**

122.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

123.    At all relevant times, the Company was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of

Case 2:25-cv-02768-DWL   Document 11   Filed 12/01/25   Page 26 of 30

the Plan's assets.

124.    As a fiduciary of the Plan, the Company was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

125.    The Company breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Company failed to employ a prudent process for the administration and use of Plan forfeitures. The Company did not analyze, evaluate, or otherwise consider how forfeiture amounts should be applied for the exclusive benefit of Plan participants and beneficiaries. The Company's failure to undertake any reasoned or diligent process with respect to forfeitures constitutes a breach of the duty of prudence in violation of ERISA § 404(a)(1)(B).

126.    The Company used Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

127.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and its participants suffered millions of dollars in losses.

128.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Company is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

**COUNT IV**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Gen Digital and the Board Defendants)**

129.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in

- 26 -
AMENDED CLASS ACTION COMPLAINT

this Complaint as if fully set forth herein.

130.    Gen Digital and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

131.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

132.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

133.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, and standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions.

134.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

135.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

### PRAYER FOR RELIEF

AMENDED CLASS ACTION COMPLAINT

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. For statutory penalties in an amount to be determined at trial, pursuant to 29 U.S.C. § 1132(c)(1), 29 U.S.C. § 1024(b)(4), and 29 C.F.R. § 2575.502c-1;

G. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an

independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

J.      An award of pre-judgment interest;

K.      An award of costs pursuant to 29 U.S.C. § 1132(g);

L.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

M.      Such other and further relief as the Court deems equitable and just.

Dated:   December 1, 2025

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(Admitted Pro Hac Vice)
James Maro, Esquire
PA Attorney ID # 86420
(Admitted Pro Hac Vice)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Telephone:  (610) 890-0200
Fax:  (717) 232-3080
Email: markg@capozziadler.com
        jamesm@capozziadler.com

Jay F. Parmelee (Atty. ID #034477)
**DENTON PETERSON DUNN**
1930 N. Arboleda, Suite 200
Mesa, AZ  85213
Telephone: (480) 325-9900
Fax: (480) 325-9901
Email: Jay@dentonpeterson.com

*Counsel for Plaintiffs and the Putative Class*

AMENDED CLASS ACTION COMPLAINT

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:   */s/Mark K. Gyandoh*
Mark K. Gyandoh, Esq.

AMENDED CLASS ACTION COMPLAINT